2001 ND 199

**In the Matter of the JUDICIAL VACANCY IN DISTRICT JUDGESHIP NO. 6, With Chambers in Minot, North Dakota, Northwest Judicial District.**

No. 20010229.

Supreme Court of North Dakota.

Dec. 14, 2001.

ORDER

[¶ 1] The sad occasion of the death of our colleague The Honorable Glenn Dill III on September 12, 2001, and the subsequent notice received from Governor John Hoeven of the vacancy of Judgeship No. 6 chambered in Minot require this Court to consider the judgeship under § 27–05–02.1, N.D.C.C., which provides:

1. Notwithstanding section 44–02–03, when a vacancy occurs in the office of district court judge, the supreme court shall determine, within ninety days of receiving notice of the vacancy from the governor and in consultation with the judges and attorneys in the affected judicial district, whether that office is necessary for effective judicial administration or whether a district judgeship may be transferred to the location to fulfill a need for judicial services. The supreme court may, consistent with that determination, order that:

a. The vacancy be filled in the manner provided pursuant to chapter 27–25;

b. The vacant office be abolished, with or without transfer of a district judgeship as provided by subsection 5; or

c. The vacant office be transferred to a judicial district in which an additional judge is necessary for effective judicial administration, and that the vacancy be filled in the manner provided pursuant

to chapter 27–25 with respect to that judicial district.

[¶ 2] Under § 27–17–03, N.D.C.C., and N.D. Sup.Ct. Admin. R. 7.2, the Court designated the Honorable James H. O'Keefe, Surrogate Judge, Hearing Officer to conduct a hearing and to receive written comments in this matter. . Judge O'Keefe conducted a public hearing in Minot, North Dakota, in the Ward County Courthouse, on November 5, 2001. The written comments received by the Hearing Officer included the Statement of Presiding Judge Robert W. Holte in support of retaining the judgeship in Minot; a Request for the Transfer/Relocation of the judgeship to the Southeast Judicial District with chambers in Jamestown, submitted by Presiding Judge John T. Paulson; and a Request for the Transfer/Relocation of the judgeship to the East Central Judicial District, submitted by Presiding Judge Michael O. McGuire. Judge O'Keefe's written report of the hearing and his recommendations, together with the written comments and a transcript of the hearing held in Minot, were submitted to the Court on November 19, 2001. Judge O'Keefe recommended the judgeship be retained in Minot.

[¶ 3] For purposes of consultation with the judges and attorneys in the affected judicial districts, the Court conducted a hearing in the Ralph J. Erickstad Courtroom of the Supreme Court in Bismarck on November 27, 2001.

[¶ 4] Section 4 of N.D. Sup.Ct. Admin. R. 7.2 provides the criteria for consideration on the retention or transfer of the judgeship:

The hearing officer or hearing panel, or the Supreme Court, or both, shall consider evidence regarding the following criteria concerning disposition of the vacancy:

1. Population;
2. Caseloads and unusual case types;
3. Trends in 1 and 2;
4. Impact of proposed vacancy disposition on travel requirements;
5. Age or possible retirement of remaining judges in the affected judicial district; and
6. Availability of facilities (e.g., law enforcement, correctional, and court facilities).

[¶ 5] Under these criteria, the Court has considered all of the submissions received by the Court and submitted to the Hearing Officer. The Court has also considered its own administrative records and public information pertaining to the criteria available from other public agencies of government. Because Ward County, Stutsman County and Cass County each have adequate and appropriate law enforcement, correctional and court facilities, we have determined criterion 6 is not a factor in our determination. Criterion 5 is not a significant consideration in this decision.

[¶ 6] Applying criteria 1 through 4, we determine that retention of Judgeship No. 6 in Minot is not necessary for the effective judicial administration in that district and the judgeship shall be transferred to the East Central Judicial District to be chambered in Fargo where an additional judge is necessary for effective judicial administration. The judgeship shall be designated Judgeship No. 8 and the vacancy in this judgeship shall be filled in the manner provided in chapter 27–25 with respect to the East Central Judicial District.

[¶ 7] In arriving at this decision we have considered the following information pertaining to criteria 1 through 4:

## I. Population and Trends.

[¶ 8] We have considered population and trends on a district wide basis and also

for the specific county in or to which it has been proposed the judgeship be retained or transferred. To examine trends in population changes, we have reviewed data assembled by the U.S. Census Bureau and the North Dakota State Data Center at North Dakota State University ("State Data Center"). The population changes from 1990 to 2000 in the districts under review are reflected in the following graph based on data assembled by the State Data Center and the U.S. Census Bureau in its Profiles of General Demographic Characteristics: 2000:

| Judicial District | 1990 Population | 1995 Population | 2000 Population |
| --- | --- | --- | --- |
| East Central (3 counties) | 114,046 | 122,763 | 133,873 |
| Northwest (6 counties) | 98,355 | 96,792 | 95,449 |
| Southeast (11 counties) | 90,995 | 87,855 | 86,767 |

[¶ 9] Analysis done by the State Data Center provides the following population projections for 2005, 2010, and 2015.

| Judicial District | Projected 2005 Population | Projected 2010 Population | Projected 2015 Population |
| --- | --- | --- | --- |
| East Central (3 counties) | 134,324 | 138,921 | 143,266 |
| Northwest (6 counties) | 97,114 | 97,353 | 97,506 |
| Southeast (11 counties) | 83,951 | 83,030 | 82,040 |

[¶ 10] This population data illustrates clearly discernible trends. Over the past two census periods, the East Central Judicial District has experienced a steady increase in population. The increase is projected to continue for the next decade. Over the last two census periods, the population in the Northwest and Southeast Judicial Districts has generally declined and population projections for the next decade indicate marginal change. The impact of these population dynamics is reflected in the relationship between available or potential judicial resources and the population within the districts. Based on the 2000 population, the East Central Judicial District, with 7 judges and 2 referees, has a population per judge/referee of 14,875. An additional judge in the district reduces the population per judge/referee to 13,387. The Northwest Judicial District, with 7 judges and 1 referee, has a population per judge/referee of 11,931. The loss of a judge in that district increases the population per judge/referee to 13,636. The Southeast Judicial District, with 6 judges and no referees, has a population per judge of 14,461. An additional judge in the district would reduce the population per judge/referee to 12,395. Thus, based on 2000 population figures, the transfer of the vacant judgeship to the East Central Judicial District results in relative parity in population per judge/referee. This relative parity remains constant when considering projected district populations over the next fifteen years. Based on the projected 2010 population, the East Central Judicial District with an additional judge would have a population per judge/referee of 13,892. The Northwest Judicial District after a transfer would have a population per judge/referee of 13,907. The Southeast Judicial District, with the current

complement of 6 judges, would have a population per judge of 13,838. When considering the projected 2015 population, the East Central Judicial District with an additional judge would have a population per judge/referee of 14,327. The Northwest Judicial District after a transfer would have a population per judge/referee of 13,929, and the Southeast Judicial District, with 6 judges, would have a population per judge of 13,673.

[¶ 11] Because the location of the main population centers within a district also affects the amount of travel required of judges in the district, we also note the population changes in the specific county in which it is proposed that the judgeship be retained or transferred. The following graph based on information from the State Data Center and the U.S. Census Bureau Profiles reflects county populations.

| Counties | 1990 Population | 1995 Population | 2000 Population |
|---|---|---|---|
| Cass | 102,874 | 111,802 | 123,138 |
| Ward | 57,921 | 58,711 | 58,795 |
| Stutsman | 22,241 | 21,387 | 21,908 |

Projections assembled by the State Data Center for populations in these counties in 2005, 2010, and 2015 are shown in the next graph.

| Counties | Projected 2005 Population | Projected 2010 Population | Projected 2015 Population |
|---|---|---|---|
| Cass | 123,511 | 128,096 | 132,486 |
| Ward | 60,880 | 61,531 | 62,049 |
| Stutsman | 20,821 | 20,820 | 20,762 |

[¶ 12] County-specific population data over the last two census periods and projections for the next fifteen years confirm the district-wide trend noted above.

[¶ 13] The ten-year period from 1990 to 2000 also shows a significant change in the population age spread as reflected in the changes in the population aged 0 to 17 years in the counties in the districts under consideration. The following graphs based on the U.S. Census Bureau Decennial Censuses show this population change.

**Children Ages 0 to 17 Years**

| East Central District | 1990 Census | 2000 Census | Numeric Change | Percent Change |
|---|---|---|---|---|
| Cass | 25,690 | 28,848 | + 3,158 | + 12.29 |
| Steele | 632 | 624 | − 8 | − 1.27 |
| Traill | 2,244 | 2,104 | − 140 | − 6.24 |
| Total | 28,566 | 31,576 | + 3,010 | + 10.54 |
| Northwest District | 1990 Census | 2000 Census | Numeric Change | Percent Change |
| Burke | 742 | 467 | − 275 | − 37.06 |
| Divide | 692 | 462 | − 230 | − 33.24 |
| McKenzie | 2,111 | 1,756 | − 355 | − 16.82 |
| Mountrail | 2,108 | 1,860 | − 248 | − 11.76 |

| | | | | |
|---|---|---|---|---|
| Ward | 16,252 | 15,423 | − 829 | − 5.10 |
| Williams | 6,326 | 5,172 | − 1,154 | − 18.24 |
| Total | 28,231 | 25,140 | − 3,091 | − 10.95 |

| Southeast District | 1990 Census | 2000 Census | Numeric Change | Percent Change |
|---|---|---|---|---|
| Barnes | 3,092 | 2,624 | −468 | − 15.14 |
| Dickey | 1,527 | 1,369 | − 158 | − 10.35 |
| Eddy | 738 | 651 | − 87 | − 11.79 |
| Foster | 1,094 | 985 | − 109 | − 9.96 |
| Griggs | 857 | 621 | − 236 | − 27.54 |
| LaMoure | 1,465 | 1,138 | − 327 | − 22.32 |
| Ransom | 1,531 | 1,471 | − 60 | − 3.92 |
| Richland | 4,917 | 4,437 | − 480 | − 9.76 |
| Sargent | 1,224 | 1,155 | − 69 | − 5.64 |
| Stutsman | 5,785 | 5,005 | − 780 | − 13.48 |
| Wells | 1,434 | 1,149 | − 285 | − 19.87 |
| Total | 23,664 | 20,605 | − 3,059 | − 12.93 |

[¶ 14] Age distribution within a district affects the need for judicial services. As discussed below in the description of the weighted caseload study, juvenile dependency and juvenile delinquency proceedings are assigned great weight in the caseload study because of significant demands on judicial time for each case type. Therefore, a district with a significantly higher proportion of minors will place greater demand on judicial services than the same population with older members.

[¶ 15] Conversely, an increasingly elderly population makes fewer demands on the judicial system than the same number of younger citizens. This is particularly true with respect to age and the commission of criminal offenses. Statistics prepared by the Office of Attorney General's Bureau of Criminal Investigation shows a significant drop in arrests of persons over the age of 44.

**Arrests by Age Group, 1990–1999**

| Age Group | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| Under 10 | 213 | 217 | 200 | 207 | 199 | 281 | 208 | 204 | 205 | 202 |
| 10–12 | 573 | 713 | 809 | 754 | 765 | 895 | 881 | 953 | 758 | 628 |
| 13–14 | 1486 | 1677 | 1784 | 1827 | 2137 | 2396 | 2433 | 2429 | 2165 | 1877 |
| 15 | 1272 | 1223 | 1461 | 1395 | 1609 | 1796 | 2077 | 1980 | 1775 | 1586 |
| 16 | 1370 | 1340 | 1501 | 1873 | 1646 | 2044 | 2138 | 2115 | 2034 | 1977 |
| 17 | 1586 | 1455 | 1686 | 1687 | 1890 | 2020 | 2201 | 2099 | 2238 | 2159 |
| 18 | 1763 | 1906 | 1887 | 1810 | 1828 | 2306 | 2238 | 2210 | 2610 | 2356 |
| 19 | 2072 | 1878 | 2110 | 1783 | 2143 | 2238 | 2279 | 2330 | 2611 | 2693 |
| 20 | 1779 | 1777 | 1749 | 1753 | 1774 | 1997 | 1991 | 2170 | 2366 | 2220 |
| 21 | 1138 | 1081 | 1086 | 1057 | 1200 | 1320 | 1304 | 1240 | 1385 | 1186 |
| 22 | 970 | 902 | 1029 | 1057 | 1057 | 1149 | 1163 | 1166 | 1063 | 1039 |
| 23 | 860 | 768 | 809 | 858 | 930 | 940 | 1026 | 922 | 1040 | 807 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 839 | 703 | 703 | 677 | 859 | 951 | 929 | 911 | 821 | 741 |
| 25–29 | 3340 | 3104 | 2830 | 2841 | 3002 | 3242 | 3506 | 3451 | 3390 | 2858 |
| 30–34 | 2204 | 2214 | 2258 | 2347 | 2542 | 2910 | 3023 | 2709 | 2642 | 2230 |
| 35–39 | 1460 | 1587 | 1624 | 1711 | 1854 | 2278 | 2264 | 2494 | 2497 | 2166 |
| 40–44 | 935 | 1012 | 1029 | 1046 | 1244 | 1431 | 1633 | 1710 | 1689 | 1500 |
| 45–49 | 613 | 579 | 592 | 659 | 717 | 901 | 918 | 958 | 967 | 919 |
| 50–54 | 359 | 379 | 373 | 378 | 463 | 485 | 516 | 523 | 513 | 515 |
| 55–59 | 280 | 243 | 213 | 226 | 225 | 262 | 251 | 266 | 270 | 234 |
| 60–64 | 169 | 132 | 149 | 122 | 126 | 154 | 143 | 153 | 108 | 107 |
| 65+ | 227 | 249 | 244 | 292 | 263 | 256 | 225 | 215 | 221 | 198 |
| Age Not Reported | | 393 | 445 | 310 | 264 | 147 | 267 | 426 | 185 | 60 |
| Arrest Total | 25508 | 25532 | 26571 | 26670 | 28737 | 32399 | 33614 | 33634 | 33548 | 30258 |

[¶ 16]   The Profiles of General Demographic Characteristics: 2000 prepared by the U.S. Census Bureau indicates that North Dakota has 233,342 people or 36.33% of the state's population over the age of 44.

[¶ 17]   For the districts under consideration, the following graphs based upon the U.S. Census Bureau Profiles show the percentage of population over age 44 by county:

### East Central

| County | Total Population | Population Over 44 | Percentage Over 44 |
|---|---|---|---|
| Cass | 123,138 | 36,055 | 29.28% |
| Steele | 2,258 | 1,006 | 44.55% |
| Traill | 8,477 | 3,452 | 40.72% |
| Total | 133,873 | 40,513 | 30.26% |

### Northwest

| County | Total Population | Population Over 44 | Percentage Over 44 |
|---|---|---|---|
| Burke | 2,242 | 1,197 | 53.39% |
| Divide | 2,283 | 1,281 | 56.11% |
| McKenzie | 5,737 | 2,326 | 40.54% |
| Mountrail | 6,631 | 2,782 | 41.95% |
| Ward | 58,795 | 18,622 | 31.67% |
| Williams | 19,761 | 7,999 | 40.48% |
| Total | 95,449 | 34,207 | 35.84% |

### Southeast

| County | Total Population | Population Over 44 | Percentage Over 44 |
|---|---|---|---|
| Barnes | 11,775 | 5,115 | 43.44% |
| Dickey | 5,757 | 2,506 | 43.53% |
| Eddy | 2,757 | 1,319 | 47.84% |
| Foster | 3,759 | 1,594 | 42.40% |
| Griggs | 2,754 | 1,418 | 51.49% |
| LaMoure | 4,701 | 2,228 | 47.39% |

| | | | |
|---|---|---|---|
| Ransom | 5,890 | 2,572 | 43.67% |
| Richland | 17,998 | 6,344 | 35.25% |
| Sargent | 4,366 | 1,860 | 42.60% |
| Stutsman | 21,908 | 8,956 | 40.88% |
| Wells | 5,102 | 2,563 | 50.24% |
| **Total** | 86,767 | 36,475 | 42.04% |

## II. Caseload and Trends.

[¶ 18] The Court has reviewed the weighted caseload studies for 1997 through 2000. A weighted caseload study allocates the amount of judicial resources (including judges and judicial referees) needed to handle cases in the district after weighting each type of case by the amount of time required to process an average case of that type. The study adjusts each district for travel time depending on whether that district requires high travel, moderate travel, or low travel time from the judicial officers serving the district. In 1997 through 2000, the East Central Judicial District was designated a low travel district, the Northwest Judicial District was designated a moderate travel district, and the Southeast Judicial District was designated a high travel district. The study also allocates time not available for handling cases but which is required in each district for the presiding judge to handle administrative matters. The resulting computation is the minimum judicial resources (expressed as a "judicial FTE", which includes both judges and judicial referees) to meet the needs of the district based upon weighted case filings. The study does not include juvenile dismissals, which occur either when a state's attorney declines to file a juvenile petition or when a judge or judicial referee dismisses a petition. Juvenile dismissals are omitted from the study because they have a negligible impact on judicial workload.

[¶ 19] When the minimum judicial FTE's required are compared to the judicial FTE's currently available in a district, the difference is expressed as a positive number, indicating there are more judicial resources available than current weighted case filings require, or a negative number, indicating there are fewer judicial resources than are needed to serve that district's weighted case filings. Ideally, each district would show a small positive number, indicating judicial resources available for that district have a margin for contingencies such as the prolonged illness of a judge, absence for continuing judicial education, judicial committee assignments, and similar circumstances that are not currently accounted for in the caseload study. The weighted caseload study does reflect the mental health filings which constitute an unusual caseload in the Southeast Judicial District. The weighted caseload study does not at present reflect the impact of judicial resources committed in judicial districts to juvenile and adult drug courts.

[¶ 20] The 1997 through 2000 weighted caseload studies show the following allocation of judicial resources:

**1997 Weighted Caseload Study Without Juvenile Dismissals**
**44 Judges**
**7.48 Referees**

| DISTRICT | WEIGHTED FILINGS | JUDICIAL FTE REQUIRED | TOTAL ADJUSTED JUDICIAL FTE | DIFFERENCE |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| East Central | 632,542 | 9.38 | 8.88 | − 0.50 |
| Northeast | 404,604 | 6.95 | 6.88 | − 0.07 |
| Northeast Central | 366,282 # | 5.43 | 6.88 | + 1.45 |
| Northwest | 454,910 | 7.07 | 8.88 | + 1.81 |
| South Central | 577,863 | 8.98 | 9.36 | + 0.38 |
| Southwest | 178,917 | 2.78 | 3.88 | + 1.10 |
| Southeast | 380,050 | 6.53 | 5.88 | − 0.65 |
| Totals | 2,995,169 | 47.11 | 50.64 | + 3.53 |

# The Northeast Central Judicial District experienced a 26% reduction in civil filings in 1997 when compared to 1996. The reduction is believed to be caused by the April 1997 flood that closed the City of Grand Forks for several months. See North Dakota Courts, Annual Report, 1997, at 10.

**1998 Weighted Caseload Study Without Juvenile Dismissals**
**44 Judges**
**7.48 Referees**

| DISTRICT | WEIGHTED FILINGS | JUDICIAL FTE REQUIRED | TOTAL ADJUSTED JUDICIAL FTE | DIFFERENCE |
|---|---|---|---|---|
| East Central | 666,349 | 9.88 | 8.88 | − 1.00 |
| Northeast | 383,194 | 6.58 | 6.88 | + 0.30 |
| Northeast Central | 429,234 | 6.36 | 6.88 | + 0.52 |
| Northwest | 446,741 | 6.94 | 8.88 | + 1.94 * |
| South Central | 537,403 | 8.35 | 9.36 | + 1.01 |
| Southwest | 178,569 | 2.77 | 3.88 | + 1.11 |
| Southeast | 385,679 | 6.62 | 5.88 | − 0.74 |
| Totals | 3,024,731 | 47.51 | 50.64 | + 3.13 * |

* Judgeship No. 3, chambered in Minot, North Dakota, was terminated at the retirement on December 31, 1998 of the Honorable Wallace D. Berning.

**1999 Weighted Caseload Study Without Juvenile Dismissals**
**43 Judges**
**7.48 Referees**

| DISTRICT | WEIGHTED FILINGS | JUDICIAL FTE REQUIRED | TOTAL ADJUSTED JUDICIAL FTE | DIFFERENCE |
|---|---|---|---|---|
| East Central | 641,655 | 9.51 | 8.88 | − 0.63 |
| Northeast | 394,855 | 6.78 | 6.88 | + 0.10 |
| Northeast Central | 398,148 | 5.90 | 6.88 | + 0.98 |
| Northwest | 401,747 | 6.24 | 7.88 | + 1.64 |
| South Central | 511,377 | 7.94 | 9.36 | + 1.42 |
| Southwest | 173,642 | 2.70 | 3.88 | + 1.18 |
| Southeast | 390,350 | 6.70 | 5.88 | − 0.82 |
| Totals | 2,911,774 | 45.77 | 49.64 | + 3.85 |

**2000 Weighted Caseload Study Without Juvenile Dismissals**
**43 Judges**
**7.48 Referees**

| DISTRICT | WEIGHTED FILINGS | JUDICIAL FTE REQUIRED | TOTAL ADJUSTED JUDICIAL FTE | DIFFERENCE |
|---|---|---|---|---|
| East Central | 655,574 | 9.72 | 8.88 | − 0.84 |
| Northeast | 399,617 | 6.86 | 6.88 | + 0.02 |
| Northeast Central | 376,306 | 5.58 | 6.88 | + 1.30 |
| Northwest | 422,371 | 6.56 | 7.88 | + 1.32 |
| South Central | 509,719 | 7.92 | 9.36 | + 1.44 |
| Southwest | 166,753 | 2.59 | 3.88 | + 1.29 * |
| Southeast | 406,031 | 6.97 | 5.88 | − 1.09 |
| Totals | 2,936,371 | 46.20 | 49.64 | + 3.43 * |

\* Judgeship No. 5, chambered in Bowman, North Dakota, was abolished at the end of the term on December 31, 2000.

[¶ 21]   In the 1997 through 2000 weighted caseload studies, the Northwest Judicial District has consistently appeared as having more judicial resources available than weighted case filings require, while the East Central and Southeast Judicial Districts are shown as having fewer judicial resources than the weighted filings would require.

### III.   Impact of Proposed Vacancy Disposition on Travel Requirements.

[¶ 22]   As noted above, the weighted caseload study allocates travel time variously to the districts, with the East Central Judicial District assigned a low travel time adjustment, the Southeast Judicial District assigned a high travel time adjustment, and the Northwest Judicial District assigned a medium travel time adjustment. The Northwest Judicial District argues the loss of a judge in Minot will make the district a high travel district. The Southeast Judicial District argues placement of a judge in Jamestown would greatly reduce the travel time required of all the judges in the district, thereby making their time more available for the duties of judging. The East Central Judicial District does not argue the addition of a judge would significantly affect the travel adjustment of the district because the judges, with or without an addition, would be concentrated where the major population of the district resides.

[¶ 23]   A review of the actual travel mileage of the judges in the Northwest and Southeast Judicial Districts over the last biennium (July 1999 to June 2001) supports the allocation of travel time adjustments under the caseload study.

[¶ 24]   The Northwest Judicial District is comprised of 6 counties totaling 11,013 square miles. The district population under the 2000 census was 95,449. Until the death of Judge Dill, the district was served by seven judges and one referee. The judges and referee traveled 40,477 miles in the first year of the biennium or an average of 5,072 miles per judge/referee. In the second year of the biennium the judges and referee traveled 45,970 miles or an

average of 5,746 miles per judge/referee. The weighted caseload study allocates 6,150 minutes per year for travel time per judge/referee in this district.

[¶ 25] The Southeast Judicial District is comprised of 11 counties totaling 12,395 square miles. The population of the district under the 2000 census was 86,767. During the last two years the district has been served by 6 judges and no referees. During the last biennium, the judges traveled 73,137 miles or an average of 12,190 miles per judge during the first year and 69,135 miles or an average of 11,523 miles per judge during the second year. The weighted caseload study allocates 12,300 minutes per year for travel for each judge in this district.

[¶ 26] We recognize that travel in both the Northwest and Southeast Judicial Districts is greater than would be required if the distribution of judges reflected the distribution of the population. In each district, travel would be reduced by the relocation of one chambers within the district. In addition we recognize the loss of Judgeship No. 6 in Minot would have a greater impact on the district than the loss of a judgeship in another location simply because the largest population resides in Minot. However, we do not consider at this time the transfer of chambers under N.D. Sup.Ct. Admin. R. 7.1, and we are mindful of the directive of subsection 1 of § 27–05–08, N.D.C.C., which results in inefficiencies relating to travel.

[¶ 27] Assuming the computation submitted by the Northwest Judicial District of the anticipated average annual travel required is accurate at 36,672 minutes per year, the district will not become a high travel district even if the judgeship is not retained in Ward County. The average travel time per judge/referee is 5,239 minutes based upon the district's projection. The loss of a judgeship in Minot will cause

a greater need for travel adjustments. If the computation submitted by the district were adjusted by doubling the projected trips to Minot by all judges not chambered there, the total travel minutes would be 49,952 or an average of 7,136 minutes per judge/referee. This is substantially less than the average miles currently traveled by the judges in the Southeast Judicial District.

[¶ 28] We recognize this order results in 2 judges and a judicial referee remaining in Minot to meet the demands for judicial services in Ward County, with the attendant concern for the possible impact on the provision of timely judicial services. And we recognize the continuing effort by the Southeast Judicial District to provide effective judicial services to the citizens of that district.

[¶ 29] We conclude, however, that the clear trends in population generally, the impact of a younger population on the need for judicial services, and the weighted caseload studies illustrate effective judicial administration is best served by transfer of the vacant judgeship to the East Central Judicial District. We will make available to the Northwest and Southeast Judicial Districts assistance to optimize the use of judicial resources.

[¶ 30] IT IS HEREBY ORDERED, the unexpired term in vacant Judgeship No. 6 shall be transferred to the East Central Judicial District. The judgeship shall be designated as Judgeship No. 8, with chambers in Fargo. The vacancy in this judgeship shall be filled in accordance with ch. 27–25, N.D.C.C. and N.D. Const. art. VI, § 13, as amended effective June 9, 1998.

[¶ 31] Dated at Bismarck, North Dakota, this 14 day of December, 2001.

**13**

[¶ 32] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, MARY MUEHLEN MARING, WILLIAM A. NEUMANN, and DALE V. SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring.

[¶ 33] I agree with the findings of the order and I reluctantly agree with the conclusion that the vacant judgeship be transferred from the Northwest to the East Central Judicial District. I write to explain my concern.

[¶ 34] During the Court's consultation with the judges and attorneys of the affected judicial district on November 27, 2001, one of the participants urged us to first consider the need for the judgeship in the Northwest Judicial District and only if it is not needed in that district should we consider transfer to another district. Although this procedure appears logical, it ignores the reality that we are presently required to operate the judicial system with 42 trial judges and that the comparative needs of the districts must be considered when a vacancy occurs. I believe the Court's order today does exactly that.

[¶ 35] Nevertheless, that comparative need must be kept in perspective, and it is this comparison which causes my concern. I have confidence in our weighted caseload statistics. I believe they generally reflect the need for judges in the State and in the districts, but they concededly contain some subjective measurements. They may not account for all the factors. For example, there may be an economy of scale of having all the judges in one location, such as in the East Central Judicial District, which is not offset by the travel-time adjustment for the other districts. The weighted caseload statistics are not, nor were they intended to be, precise mathematical measurements of need for judicial services. Therefore, when the "spread" in the need

for judicial positions between the districts is as narrow as the current statistics reflect, I am not convinced there is a need to transfer the judgeship from the Northwest Judicial District. I suggest that the "spread" be greater than evidenced in this order before the Court considers the transfer on the basis of the weighted caseload statistics alone. Thus, if all other factors were nearly equal I would not vote to transfer this judgeship on the sole basis of the weighted caseload statistics.

[¶ 36] But, I agree with the findings that all other factors are not equal. The demographics clearly portend a greater need for future judgeships in the East Central Judicial District than in the Northwest and the Southeast Judicial Districts. These demographics include not only projected population trends but the age categories within that population. In each instance the inescapable conclusion is that the East Central Judicial District will have an increasing need for judges that exceeds the need of the Northwest Judicial District and the Southeast Judicial District. When that need would cause sufficient "spread" to satisfy my concern about the preciseness of the weighted caseload statistics I do not know. Nor do I know when or where the next vacancy which might be transferred will occur. If I could order the judgeship transferred some period of years in the future, assuming the continuation of the current trends, I would do so. The statutes do not permit—and perhaps should not permit—that solution. I therefore concur in the order transferring the judgeship from the Northwest Judicial District and I concur in the transfer to the East Central Judicial District.

[¶ 37] GERALD W. VANDE WALLE, C.J., concur.